# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|                              |   |
|------------------------------|---|
| **TERESA GERVAIS,**          | ) |
|                              | ) |
| **Plaintiff,**               | ) |
|                              | ) |
| **v.**                       | ) |
|                              | ) |
| **FRANKLIN PUBLIC SCHOOLS,** | ) |
|                              | ) |
| **Defendant.**               | ) |

**Civil Action No. 09-10719-DJC**

_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                          March 23, 2012

## I.      Introduction

Plaintiff Teresa Gervais ("Gervais") brings this action against her former employer, Defendant Franklin Public Schools ("FPS"), for violating federal and Massachusetts law by discriminating against her on the basis of her pregnancy.  FPS has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons set forth below, FPS' motion is GRANTED.

## II.     Burden of Proof and Standard of Review

To prevail at summary judgment, the moving party must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

Once the moving party has made such a showing, the burden shifts to the non-moving party to set forth specific evidence showing that there is a genuine, triable issue of fact. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). In satisfying this burden, the non-moving party "may not rest upon mere allegation or denials," Anderson, 477 U.S. at 256, and "cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute," Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 52 (1st Cir. 2000). "Even in employment discrimination cases 'where elusive concepts such as motive or intent are at issue,' this standard compels summary judgment if the non-moving party 'rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

At all stages of the analysis, the Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). If after viewing the record in this light the Court determines that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, summary judgment is appropriate. Fed. R. Civ. P. 56(a).

**III.     Factual Allegations**

Unless otherwise indicated, the following facts are undisputed.[1]

_____

[1] For the purposes of this Memorandum and Order, the parties' filings are abbreviated as follows: Complaint, D. 1 ("Complaint"); FPS' answer, D. 7 ("Answer"); FPS' memo in support of its motion for summary judgment, D. 25 ("FPS Memo"); Gervais' memo in opposition to FPS' motion for summary judgment, D. 28 ("Gervais Memo"); FPS' statement of material facts, D. 26 ("FPS Facts"); Gervais' statement of facts, D. 29 ("Gervais Facts"). Additionally, the majority of the numbered exhibits attached to Gervais' statement of facts are duplicates of the lettered exhibits attached to FPS' statement of facts. Compare Gervais Facts Ex. 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 14, 15, 16, 20-21, D. 29 with, respectively, FPS Facts Ex. E, A, M, H, O, P, Q, S, J,

Gervais lives in Cranston, Rhode Island. FPS Facts Ex. A, Deposition of Plaintiff Teresa Gervais ("Gervais Dep."), D. 26-1 at 7. FPS is a public school district located in Franklin, Massachusetts. FPS Facts Ex. B, Affidavit of FPS Superintendent Wayne Ogden ("Ogden Aff."), D. 26-2 at 2.

## A.  FPS Hires Gervais

On August 29, 2005, FPS hired Gervais to serve as an elementary school music teacher. FPS Facts Ex. D, D. 26-2 at 14. At the time, she had a bachelor's degree in flute performance from Florida State University and was studying for a Master's degree in music education at Rhode Island College, Gervais Dep., D. 26-1 at 7, and was certified to teach music in Rhode Island, Gervais Dep., D. 26-1 at 10, but was not yet certified to teach music in Massachusetts. Gervais Dep., D. 26-1 at 10. Her teaching experience at that point was one semester's worth of practice experience under the guidance of a professor and between 75 and 80 days working as a student music teacher in high school and middle school, all acquired as part of her college studies, as well as working as a private flute and piano tutor for individual students; she had never worked as a full-time teacher. Gervais Dep., D. 26-1 at 8-9. Gervais received both her Master's degree and her Massachusetts certification within a year of being hired. Gervais Dep., D. 26-1 at 7, 10. FPS assigned Gervais to teach music full-time to elementary school students at two schools–Oak Street Elementary and Parmenter Elementary–and to be in charge of each school's student chorus, each of which met once a week before school. Gervais Dep., D. 26-1 at 9-10, 20. Gervais' main school was Oak Street Elementary. D. 26-1 at 9.

FPS hired Gervais pursuant to Mass. Gen. L. c. 71, § 41, which governs (among other things)

L, V, U, T, N, W, D. 26.  When referring to duplicate materials, the Court will refer to the copy included in the earlier-filed set of exhibits provided by FPS.  D. 26.

the hiring of teachers who have not yet attained professional status under state law. Ogden Aff., D. 26-2 at 2-3; see also Mass. Gen. L. c. 71, § 41. Pursuant to that statutory provision, a teacher receives professional status, and the tenure protections that attach to such status, after working at the same school for three consecutive years. See Mass. Gen. L. c. 71, §§ 41-42. A teacher without professional status may be non-renewed for the subsequent school year provided that notice of non-renewal is provided on or before June 15. Ogden Aff., D. 26-2 at 2-3. Gervais understood that during her initial employment with FPS she would be working on a series of one-year contracts and that she would not receive professional teacher status until she had worked for FPS for three consecutive years. Gervais Dep., D. 26-1 at 10-11.

During her employment with FPS, Gervais was a member of the local teachers' union, Gervais Dep., D. 26-1 at 14, which had reached a collective bargaining agreement with FPS. FPS Facts Ex. G, Affidavit of FPS Director of Human Resources Lisa O'Keefe Trainor ("O'Keefe Trainor Aff."), D. 26-3 at 3; FPS Facts Ex. H, Teacher Agreement Between the Franklin School Committee and the Franklin Education Association ("CBA"), D. 26-3 through 26-5. The CBA contained specific provisions regarding the evaluation of all FPS teachers, including non-professional status teachers such as Gervais. CBA, D. 26-4 at 10-59 and D. 26-5 at 1-6 ("Appendix D Staff Evaluation Policies and Procedures"). In addition to the CBA, Gervais received a faculty handbook specific to Oak Street Elementary, which discussed the rights and responsibilities of Oak Street Elementary employees. FPS Facts Ex. I, Oak Street Elementary School Faculty Handbook ("Faculty Handbook"), D. 26-5 at 22-41 through 26-6 at 1-18.

B. Contemporaneous Records of the 2005-06 School Year

Twice during the 2005-06 school year, Oak Street Principal Corine Minkle observed and evaluated Gervais' teaching. The evaluations were recorded on an evaluation form that listed seven

criteria–"currency in the curriculum," "effective planning and assessment of curriculum instruction," "effective management of classroom environment," "effective instruction," "promotion of higher standards and expectations for students' achievement," "promotion of equity and appreciation of diversity," and "fulfillment of professional responsibilities"–and for each criterion allowed for an evaluation of "favorable," "focus for growth," or "unfavorable," as well a box to check if the criterion was not applicable and room for narrative commentary. See, e.g., CBA, D. 26-4 at 14-18, 29-30 (model forms); FPS Facts Ex. M, October 20, 2005 Observation Form ("10/20/05 Observation Form"), D. 26-6 at 26-31 through 26-7 at 1-2. During her first observation on October 20, 2005, Principal Minkle watched Gervais teaching and evaluated her performance as "favorable" with regard to five of six relevant criteria and noted a "focus for growth" with regard to the "effective instruction" criterion. 10/20/05 Observation Form, D. 26-6 at 26. In the narrative section, Principal Minkle noted that "Mrs. Gervais greeted the students," but that after the initial greeting, "it is suggested to frame the lesson to help the students see the Big Picture. With the students sitting on the floor, Mrs. Gervais should state the lesson agenda." 10/20/05 Observation Form, D. 26-6 at 27. After providing an example of how to state a lesson agenda, Principal Minkle noted that "[a] suggestion would be to have a visual schedule on the board as well." 10/20/05 Observation Form, D. 26-6 at 27.

Under the terms of the CBA, "'Focus for Growth' is intended to mean a standard of practice that requires a staff member's attention on improved instructional and professional practice," and if an observer or evaluator "identif[ies] any area or areas as focus for growth, then he/she will develop specific recommendations to promote growth. . . . When 'Focus for Growth' or 'Unfavorable' ratings are indicated [on an evaluation form], comments, recommendations and explanations are required." CBA, D. 26-4 at 12. The CBA is otherwise silent as to the proper

interpretation of the term "focus for growth."  CBA, D. 26-3 through 26-5.

On February 10, 2006, Principal Minkle observed Gervais teaching for a second time.  FPS Facts Ex. O, February 10, 2006 Observation Form ("2/10/06 Observation Form"), D. 26-7 at 9. Again, Principal Minkle evaluated Gervais' performance as "favorable" with regard to five of six relevant criteria and noted a "focus for growth" with regard to the "effective instruction" criterion 2/10/06 Observation Form, D. 26-7 at 9.  In the narrative section, Principal Minkle noted that "Mrs. Gervais framed today's lesson by helping the students see the Big Picture," and noted again that "[a] suggestion would be to have a visual schedule on the board."  2/10/06 Observation Form, D. 26-7 at 10.

Additionally, FPS records show that Gervais was absent from work twelve times during her first year of employment as a teacher, with seven of the twelve absences falling on a Monday or a Friday.  FPS Facts Ex. J, 2005-06 Attendance, D. 26-6 at 20.

On May 22 and 23, 2006, Principal Minkle prepared a Final Evaluation Report for Gervais with regard to the 2005-06 school year and discussed it with Gervais.  FPS Facts Ex. P, 2005-06 Final Evaluation Report, D. 26-7 at 17-19.  Principal Minkle gave Gervais "favorable" marks with regard to each of the seven criteria including "effective instruction."  2005-06 Final Evaluation Report, D. 26-7 at 17.  In the narrative section reserved for a discussion of the "effective instruction" criterion, Principal Hinkle noted that Gervais helped the third-grade teachers with music for two events for their students and co-planned a school-wide arts night with four other teachers and that "Mrs. Gervais maintains an upbeat and positive attitude and is a respected and valued team player and an excellent role model for both students and staff."  2005-06 Final Evaluation Report, D. 26-7 at 19.  The report did not include any discussion of Gervais' performance with regard to helping students see the "Big Picture" during class lessons or with regard to the use of visual aids, nor did

it include any discussion of Gervais' absences.  2005-06 Final Evaluation Report, D. 26-7 at 17-19.

Principal Minkle recommended reappointing Gervais for the next school year and advancing her on

the salary scale.  2005-06 Final Evaluation Report, D. 26-7 at 17.

On August 28, 2006, FPS notified Gervais that her employment would be renewed for the

upcoming 2006-07 school year.  FPS Facts Ex. Q, Fiscal Year 2007 Salary Notification, D. 26-7 at

21.

C.  Contemporaneous Records of the 2006-07 School Year

Principal Minkle observed and evaluated Gervais' teaching again during the 2006-07 school

year.  On October 30, 2006, Principal Minkle observed Gervais teaching and evaluated her

performance as "favorable" with regard to five of six relevant criteria and noted a "focus for growth"

with regard to the "effective instruction" criterion.  FPS Facts Ex.S, October 30, 2006 Observation

Form ("10/30/06 Observation Form"), D. 26-7 at 25.  Principal Minkle's comments in the narrative

section included a note that Gervais "framed the lesson by helping the students see the Big Picture,"

and indicated that Gervais used visual aids on the board in front of the room.  10/30/06 Observation

Form, D. 26-7 at 26.  Principal Minkle also noted that "Mrs. Gervais has her thirty minute time

management under control but in our post observation discussion, we discussed the possibility of"

altering the way Gervais rotated the use of musical instruments among her students "in order to

provide a deeper understanding in the 30 minute period."  10/30/06 Observation Form, D. 26-7 at

27.

FPS records show that Gervais was absent from work thirteen times during her second year

of employment, including two absences for bereavement, with six non-bereavement absences falling

on a Monday or a Friday.  FPS Facts Ex. L, 2006-07 Attendance, D. 26-6 at 24.

By letter dated May 7, 2007, FPS notified Gervais that her contract would not be renewed

for the 2007-08 school year. FPS Facts Ex. U, May 7, 2007 Letter from Ogden to Gervais, D. 26-8 at 3.

A day later, on May 8, 2007, FPS received a letter from Gervais, addressed to Superintendent Ogden, that stated in full: "I am writing to inform you that I am pregnant and due on August 8, 2007. I plan to work until the end of this school year (June 2007) at which time I am requesting maternity sick leave until eight weeks after the birth of my baby. At that time, I am requesting to return from maternity leave on Monday, October 8, 2007, at which time I plan to return to my current position." FPS Facts Ex. V, Gervais Pregnancy Notification, D. 26-8 at 5. Attached to the letter was a note from Dr. M. David Beitle, dated January 29, 2007, which stated "Teresa is a patient under my care. She is pregnant with an estimated date of delivery of 8/8/07." Gervais Pregnancy Notification, D. 26-8 at 6. Although Gervais' letter is dated February 1, 2007, Gervais Pregnancy Notification, D. 26-8 at 5, the letter is also stamped with a "May 8 2007" mark and uncontroverted evidence in the record suggests that the letter was not delivered to FPS until that date.[2] This letter

---

[2] A considerable amount of Gervais' deposition was devoted to determining the date when Gervais transmitted her letter notifying FPS of her pregnancy to Superintendent Ogden. In her deposition testimony, Gervais stated that "I prepared it on February 1st. That's why it's dated that. I did not send it in for a little while later . . . I estimate that I sent it in maybe March or April," but conceded that her estimate was based on "just my recollection." Gervais Dep., D. 26-1 at 28. She also noted that "I believe I probably did [send the letter by] interoffice mail, so by the time it got to them maybe it was May 8th, but I could have put it in the mail before . . . I'm not sure." Gervais Dep., D. 26-1 at 29. When asked if she disputed FPS' record that "reflect receipt in May of 2007," she replied "I don't know that I dispute it. I just wish I had changed this date because I really don't recall," and conceded she did not have any facts or records "that would conflict with the superintendent's receipt of [the letter] on May 8, 2007." Gervais Dep., D. 26-1 at 29. Additionally, Superintendent Ogden stated in his affidavit that the letter "was marked as received by my office on May 8, 2007," and that "I recall no notice of Ms. Gervais' pregnancy and/or request for leave which predates the May 8, 2007 notice from Ms. Gervais." Ogden Aff., D. 26-2 at 6. Because the evidence showing that the letter was received by Superintendent Ogden on May 8, 2007 is contradicted only by "unsupported speculation," the Court treats FPS' assertion that the letter was received on May 8, 2007 as a fact that is not "authentically disputed." Medina-Munoz, 896 F.2d at 8.

is the only written notification provided by Gervais to FPS in connection with her pregnancy. FPS Facts Ex. F, Gervais' Answers to Interrogatories, D. 26-2 at 21-22.

On May 31, 2007, Principal Minkle prepared a Final Evaluation Report for Gervais with regard to the 2006-07 school year and discussed it with Gervais. FPS Facts Ex. T, 2006-07 Final Evaluation Report, D. 26-7 at 34-36 through 26-8 at 1. Principal Minkle gave Gervais "favorable" marks with regard to six of the seven criteria and gave her a "focus for growth" mark for "effective instruction." 2006-07 Final Evaluation Report, D. 26-7 at 34. In the narrative section reserved for a discussion of the "effective instruction" criterion, Principal Minkle included only positive commentary and specifically noted that Gervais "frames instruction to help the students build connections and see the Big Picture." 2006-07 Final Evaluation Report, D. 26-7 at 36. In the three pages of text filled with narrative commentary, the only comment that can be interpreted as less than positive is Principal Minkle's suggestion that "[a] goal would be to work on your attendance and arriving to school every day on time." 2006-07 Final Evaluation Report, D. 26-8 at 1. Principal Minkle noted that Gervais' evaluation, taken as a whole, was "favorable," 2006-07 Final Evaluation Report, D. 26-7 at 34, but she nonetheless did not recommend Gervais for re-appointment. 2006-07 Final Evaluation Report, D. 26-7 at 34.

Principal Minkle provided Gervais with an unconditionally positive letter of recommendation dated June 1, 2007. Gervais Facts Ex. 18, Minkle Letter of Rec., D. 29-19 at 1. Nancy Schoen, FPS' Director of Music, provided Gervais with an unconditionally positive letter of recommendation dated June 7, 2007, where she specifically noted that "[d]uring her time in Franklin, Teresa has shown tremendous growth as a teacher." Gervais Facts Ex. 19, Schoen Letter of Rec., D. 29-20 at 1.

FPS' Office of Human Resources sent Gervais a letter dated June 13, 2007 confirming that Gervais' last day of employment with FPS would be June 14, 2007. Gervais Facts Ex. 17, June 13, 2007 HR letter, D. 29-18 at 1.

### D. Gervais' Recollection of Notifying FPS Officials of her Pregnancy

In her February 5, 2010 deposition testimony, Gervais recalled that she first learned she was pregnant in early December 2006. Gervais Dep., D. 26-1 at 27-28. She recalled that at some point in January 2007 she attended a teachers' union meeting discussing teachers' rights with regard to maternity leave and the necessary steps and notification process for taking such leave, Gervais Dep., D. 26-1 at 14, and that she reviewed the Faculty Handbook to help understand her rights as a pregnant employee. Gervais Dep., D. 26-1 at 16. Gervais notified her union representative that she was pregnant sometime that December. Gervais Dep., D. 26-1 at 30. She recalled notifying her principal - that is, former Principal Minkle - "right after winter break," in early January 2007, but did not discuss any plans for maternity leave. Gervais Dep., D. 26-1 at 30. Gervais recalled that Principal Minkle "was happy," "said congratulations," and "hugged me." Gervais Dep., D. 26-1 at 30. Indeed, Gervais recalled that at some point in the spring of 2007, Principal Minkle attended a party thrown by most of the faculty and staff of Oak Park Elementary for Gervais, one other pregnant teacher, and another teacher who was getting married, in an event Gervais described as "sort of a bridal shower and two baby showers all wrapped in one." Gervais Dep., D. 26-1 at 31. Gervais recalled that, as a general matter, Principal Minkle "seemed happy" about Gervais' pregnancy and Gervais never perceived any sort of negative reaction to her pregnancy on the part of anyone affiliated with FPS. Gervais Dep., D. 26-1 at 31. Gervais recalled that her pregnancy was beginning to show in such a way that by "around maybe April" of 2007, it became "very obvious

to everybody" in Gervais' working environment that she was pregnant.  Gervais Dep., D. 26-1 at 39.  Gervais did not recall ever having a conversation with Assistant Superintendent Sabolinski about her pregnancy, and did not recall communicating with Superintendent Ogden about her pregnancy other than via the letter received by FPS on May 8, 2007.  Gervais Dep., D. 26-1 at 31.

E.  FPS' Explanations for its Non-Renewal of Gervais' Employment

FPS submitted a number of affidavits in support of its motion for summary judgment, including affidavits by Principal Minkle, Superintendent Ogden, and Assistant Superintendent Maureen Sabolinski.  FPS Facts Ex. N, Affidavit of Oak Park Elementary Principal Corine Minkle ("Minkle Aff.") (proffered May 3, 2011), D. 26-7 at 4-7; Ex. C, Affidavit of Assistant Superintendent Maureen Sabolinski ("Sabolinski Aff.") (proffered May 3, 2011), D. 26-2 at 9-12; Ogden Aff. (proffered May 9, 2011), D. 26-2 at 2-7.  These FPS officials recalled that a "Focus for Growth" rating reflected performance that did not satisfy FPS standards and must be improved in order to ensure renewed employment, Sabolinski Aff., D. 26-2 at 10; Minkle Aff. D. 26-7 at 5, and that Gervais' ratings put her employment at risk.  Ogden Aff., D. 26-2 at 4-5.  Gervais, on the other hand, recalled that as a general matter a "Focus for Growth" rating did not reflect a failure to meet FPS standards, Gervais Dep., D. 26-1 at 13, and that her ratings in particular did not suggest "a risk that my employment would be terminated."  Gervais Dep., D. 26-1 at 22.

The FPS officials also suggested that Gervais' pattern of excused absences was adversely affecting her students.  Ogden Aff., D. 26-2 at 5; Sabolinski Aff., D. 26-2 at 9-11; Minkle Aff., D. 26-7 at 6.  Gervais, on the other hand, testified in her deposition that "I was never reprimanded [regarding absences].  I was never taken aside to say, you know, that this is excessive, you know.  And my understanding was that these days were there for us to take if we needed it."  Gervais Dep.,

D. 26-1 at 19.

In his affidavit, Superintendent Ogden recalled that in the spring of 2007, the task of making personnel decisions for the 2007-2008 school year was complicated by the fact that $2.1 million of FPS funding was depending on a Town of Franklin election scheduled for May 22, 2007; Superintendent Ogden estimated that if the budget appropriation was voted down, FPS would be faced with eliminating 28 positions, including cuts to the music program in which Ms. Gervais taught. Ogden Aff., D. 26-2 at 5. Superintendent Ogden recalled that he had to make budgetary decisions without knowing whether the budget appropriation would be available, and accordingly "notices of nonrenewal were sent to enough teachers . . . to ensure that personnel costs for the 2007-2008 school year could fit within the budget" even if the election resulted in a reduced FPS budget. Ogden Aff., D. 26-2 at 5.

Superintendent Ogden, Assistant Superintendent Sabolinski and Principal Minkle recalled meeting to discuss whether to renew Gervais' employment against the backdrop of budgetary uncertainty. Ogden Aff., D. 26-2 at 6; Sabolinski Aff., D. 26-2 at 11; Minkle Aff., D. 26-7 at 6. Principal Ogden recalled various reasons for the decision not to renew Gervais' employment, including "lack of funding for the position," "the review of her performance results by my staff and me," his recollection that "when specifically asked, school administrators failed to persuade me that Franklin Public Schools could not locate a better and more qualified music teacher," that "Ms. Gervais, although with some teaching talents, was not the right for Franklin Public Schools," and the fact that "I did not think that Ms. Gervais and/or her students would benefit from another year of her employment with Franklin Public Schools." Ogden Aff., D. 26-2 at 6. Assistant Superintendent Sabolinski recalled that "the Superintendent did not intend to renew the

employment," and "I shared his opinion regarding Ms. Gervais and it was my understanding that the building Principals were in agreement as well," and that "[p]erformance and absence issues were the reasons discussed for nonrenewal." Sabolinski Aff., D. 26-2 at 11. Additionally, she recalled that "[i]n my opinion as a professional educator and school administrator, the nonrenewal of Ms. Gervais' employment was necessary in response to budgetary needs and to advance the best interests of the students." Sabolinski Aff., D. 26-2 at 12. Similarly, Principal Minkle recalled that at her meetings with Superintendent Ogden and Assistant Superintendent Sabolinski, "[t]he consensus . . . was that Ms. Gervais would not be offered employment for the 2007-2008 school year" because her "general performance and her pattern of absences did not satisfy Franklin Public School standards" and "she had not shown sufficient development or progress as a teacher," and Principal Minkle recalled that she "agreed fully with the decision to nonrenew," since "[i]n my position as a professional educator and school administrator, the nonrenewal of Ms. Gervais' employment was necessary and in the best interests of the students of the students." Minkle Aff., D. 26-7 at 6. According to Superintendent Ogden and Assistant Superintendent Sabolinski, there was no discussion at these meetings of Gervais' pregnancy or her request for maternity leave. Ogden Aff., D. 26-2 at 6; Sabolinski Aff., D. 26-2 at 11.

Shortly after these meetings, FPS notified Gervais that her employment would not be renewed for the 2007-08 school year. May 7, 2007 Letter from Ogden to Gervais, D. 26-8 at 3. Gervais testified that she did not interpret this notification to necessarily mean that she would not be employed by FPS as a music teacher for the 2007-08 school year, but rather as a sign that her employment might depend on the pending town-wide vote regarding school funding. See Gervais Dep., D. 26-1 at 23 ("I know there was a certain date that they had to get the pink slips out to

13

everybody. And then you would just find out, you know, later on whether or not you were going to be recalled. And a lot of it depended on the - - I guess they were trying to get a tax override with the town to give them more money so that they wouldn't have to lay off so many teachers.").

Assistant Superintendent Sabolinski recalled that the budget appropriation was approved in the May 22, 2007 election and accordingly "some part of the funding necessary to restore positions in the music department and other departments was restored," but "some positions were not restored and others were reduced, as the district budget needed to be reduced by [$]2 million exclusive of the additional [electorally-approved] funds." Sabolinski Aff., D. 26-2 at 11. Similarly, Superintendent Ogden recalled that the "vote was ultimately successful and funding was restored to the music department." Ogden Aff., D. 26-2 at 6. As he recalled, however, "Ms. Gervais was not considered for hiring for the position she occupied during the 2006-2007 school year" because she "had not been recommended for reemployment for the 2007-2008 school year by me or her building Principal and this fact had not changed once additional funding had been approved." Ogden Aff., D. 26-2 at 6.

Principal Minkle recalled that her May 31, 2007 final evaluation of Gervais, which post-dated both FPS' decision to non-renew Gervais' employment and the May 22, 2007 local election, "was a favorable one" in terms of overall evaluation, but nonetheless "I did not recommend Ms. Gervais for reappointment" because "[i]n my opinion, Ms. Gervais had failed to realize the type of professional growth and development necessary to continue in her position." Minkle Aff., D. 26-7 at 6. Gervais recalled that after discussing with Principal Minkle her recommendation against reappointment in the May 31, 2007 final evaluation, "at that point I felt kind of misled. She originally had told me that it was because of the budget . . . [and] that, because I was nowhere near

14

a senior music teacher in the district, that . . . those people, if their positions were lost, that they would be able to take my position," Gervais Dep., D. 26-1 at 24, but that it was not until Gervais saw Principal Minkle's recommendation on the May 31, 2007 evaluation form that "I realized for good that I was not going to be" employed by FPS for the 2007-08 school year. Gervais Dep., D. 26-1 at 25. Gervais recalled that Principal Minkle never discussed with her any performance reasons for Gervais' non-renewal. Gervais Dep., D. 26-1 at 25-26.

F. Gervais' Replacement

In his May 9, 2011 affidavit, Superintendent Ogden recalled that Gervais' position "was offered and accepted by an individual who I believe was better qualified to provide the type and quality of music instruction that the students in Franklin Public Schools deserved." Ogden Aff., D. 26-2 at 6. Similarly, in her May 3, 2011 affidavit, Assistant Superintendent Sabolinski used nearly identical language in recalling that "[t]he available position was offered and accepted by a female teacher who I believe was better-qualified to provide the type and quality of music instruction which the students in Franklin Public Schools deserved." Sabolinski Aff., D. 26-2 at 11. Principal Minkle recalled that she was asked by Superintendent Ogden during the process of deciding whether or not to renew Gervais' employment "whether a better qualified teacher could be hired," and Principal Minkle "could not satisfy the Superintendent" that the answer was no. Minkle Aff., D. 26-7 at 6.

In a brief filed with this Court on June 10, 2011, Gervais argued that her position at FPS "was subsequently filled with an individual for whom no serious claim has been made was more or better qualified." Gervais Memo, D. 28 at 10. Gervais did not allege in her complaint that the individual who filled her position at FPS was comparably qualified (as opposed to more qualified), see generally Complaint, D. 1, nor has she pointed to any discovery material in support of the

asserttion that her successor was comparably qualified.  <u>See generally</u> Gervais Facts, Concise

Statement, D. 29.  Based on the Court's review of Gervais' deposition testimony and the discovery

filed with the Court by the parties, it appears that Gervais did not discuss her successor during her

deposition and did not produce any discovery related to her successor beyond the materials provided

to the Court by FPS.  <u>See generally</u> Gervais Dep., D. 26-1; FPS Facts, D. 29-1 through D. 29-22.

## IV.  Procedural History

Gervais filed timely discrimination complaints against FPS with the federal Equal

Employment Opprtunity Commission ("EEOC") and the Massachusetts Commission Against

Discrimination ("MCAD").  Complaint, D. 1 at ¶¶ 35, 45; Answer, D. 7 at ¶¶ 35, 45.  Gervais

received a "right to sue" letter from the federal Department of Justice on May 4, 2009, Complaint,

Ex. B, Notification of Right to Sue, D. 1-2 at 2, and a dismissal and notification of rights from the

MCAD on May 5, 2009.  Complaint Ex. C, Dismissal and Notification of Rights, D. 1-2 at 3.  Later

that same day, Gervais filed a Complaint against FPS in this Court.  Complaint, D. 1.  The

Complaint included four counts:  one for a violation of the federal Family and Medical Leave Act

("FMLA"), 29 U.S.C. § 2601 *et seq.*; one for a violation of the Pregnancy Discrimination Act

("PDA"), 42 U.S.C. § 2000e(k)[3]; one for improper denial of maternity leave under state law, Mass.

Gen. L. c. 151B, § 4(11A) and c. 149, § 105D; and one for discrimination on the basis of sex in

violation of Mass. Gen. L. c. 151B, §4(1).  Complaint, D. 1 at 3-6.

---

[3] In her complaint, Gervais refers to 42 U.S.C. § 2000e(k), which redefined discrimination "on the basis of sex" in violation of Title VII to include discrimination "because of or on the basis of pregnancy, childbirth or related medical conditions," as the "Federal Pregnancy Act" rather than the Pregnancy Discrimination Act.  Complaint, D. 1 at 4.  This Court adopts the terminology most commonly used in this Circuit when discussing 42 U.S.C. § 2000e(k).  <u>See, e.g.</u>, <u>Martinez-Burgos v. Guayama Corp.</u>, 656 F.3d 7, 12 (1st Cir. 2011); <u>Smith v. F.W. Morse & Co., Inc.</u>, 76 F.3d 413, 420 (1st Cir. 1996).

FPS has now moved for summary judgment. D. 24. The Court heard argument on FPS'

motion and took the matter under advisement.

## V. Discussion

### A. Standard for Federal Claims under the FMLA and PDA

The FMLA entitles eligible employees to twelve weeks of leave because of the birth of a son

or daughter, 29 U.S.C. § 2612, and prohibits employers from interfering with the exercise of this

entitlement and from retaliating against any employee who exercises their FMLA rights. 29 U.S.C.

§ 2615. The PDA prohibits discrimination "because of or on the basis of pregnancy, childbirth or

related medical conditions." 42 U.S.C. § 2000e(k). Where, as here, a plaintiff does not suggest the

existence of direct evidence explicitly showing intentional discrimination–the proverbial "smoking

gun," Smith v. F. W. Morse & Co., Inc., 76 F.3d 413, 421 (1st Cir. 1996)–the analytic framework

set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) governs

claims under both the FMLA and the PDA. Keeler v. Putnam Fiduciary Trust Co., 238 F.3d 5, 8-9

(1st Cir. 2001) (applying McDonnell Douglas to FMLA claims); Martinez-Burgos v. Guayama

Corp., 656 F.3d 7, 12 (1st Cir. 2011) (applying McDonnell Douglas to PDA claims).

The three stages of the McDonnell Douglas analysis as applied to pregnancy discrimination

cases are "well documented," Weston-Smith v. Cooley Dickinson Hosp., Inc., 153 F. Supp. 2d 62,

70 (D. Mass. 2001). First, a plaintiff must establish by a preponderance of the evidence a prima

facie case that (1) she was pregnant or had indicated an intention to become pregnant, (2) her job

performance had been satisfactory, but (3) the employer nonetheless dismissed her from her position

or took some other adverse employment action against her while (4) continuing to have her duties

performed by a comparably qualified person. F.W. Morse & Co., 76 F.3d at 421.[4] The burden of establishing a prima facie case is "not onerous," and carrying that burden creates a rebuttable presumption "that the employer unlawfully discriminated against the employee." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54 (1981).

At the second stage, the burden shifts to the employer to produce "an explanation to rebut the prima facie case–i.e., the burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason,'" and "'[t]he defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993) (quoting Burdine, 450 U.S. at 254-55 and n.8). The Court's function at this stage is simply to determine whether the employer has presented the sort of evidence required, rather than to weigh the evidence; "[t]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment." Id. at 509. If an employer carries its burden at this stage "the presumption of unlawful discrimination disappears." Weston-Smith, 153 F. Supp. 2d at 70.

Finally, at the third and final stage of the McDonnell Douglas framework, the burden shifts

---

[4] In its brief in support of its motion for summary judgment, FPS discussed not only the legal standard for discrimination under the FMLA and PDA, but also the separate standard for a retaliation claim under the FMLA. FPS Memo, D. 25 at 11-12. Although Gervais' complaint does mention retaliation, see Complaint, D. 1 at ¶ 30 (alleging that FPS' "termination of Mrs. Gervais was done as a result of her requesting medical leave or in retaliation for her request to take medical leave"), there is no dispute that Gervais' employment with FPS was terminated before she was able to take FMLA leave. Accordingly, the issue is not whether FPS retaliated against Gervais but rather whether FPS discriminated against Gervais in such a way as to interfere with her ability to exercise her FMLA rights. See generally Gervais Memo, D. 28 (omitting any discussion of retaliation).

back to plaintiff, who at this point has the ultimate burden of persuasion to establish by a preponderance of the evidence "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000) (internal quotations omitted). In the specific context of pregnancy discrimination claims, federal law "mandates that an employer must put an employee's pregnancy (including her departure on maternity leave) to one side in making its employment decisions" but "does not command that an employer bury its head in the sand and struthiously refrain from implementing business judgments" simply because they affect a pregnant employee, since federal law "requires a causal nexus between the employer's state of mind and the protected trait (here, pregnancy)," F.W. Morse & Co., 76 F.3d at 424-425; it is the plaintiff's burden to persuade the factfinder that such a nexus exists–that is, that the employer was motivated by discriminatory animus and that the employer's assertions to the contrary are pretextual. "The mere coincidence between that trait"–that is, the plaintiff's pregnancy–"and the employment decision may give rise to an inference of discriminatory animus." Id. at 425 (citing St. Mary's Honor Ctr., 509 U.S. at 507-08). To survive summary judgment, of course, the plaintiff need not carry that burden entirely; she needs to show merely that after viewing the undisputed facts in the light most favorable to her position, one or more genuine issues of material fact remain that, if resolved in her favor, a reasonable jury could find that the plaintiff had carried her ultimate burden. See St. Mary's Honor Ctr., 509 U.S. at 507-08 (at the third stage of the McDonnell Douglas framework, "[t]he plaintiff . . . has 'the full and fair opportunity to demonstrate,' through presentation of h[er] own case and through cross-examination of the defendant's witnesses, 'that the proffered reason was not the true reason for the employment decision,' and that [discriminatory animus] was") (quoting Burdine, 450 U.S.

at 256).

B.  Standard for Claims under Mass. Gen. L. c. 149, § 105D and c. 151B, §§ 4(1) and (11A)

Massachusetts law guarantees eligible female employees eight weeks of maternity leave, Mass. Gen. L. c. 149, § 105D, and prohibits employers from discriminating on the basis of sex, Mass. Gen. L. c. 151B, § 4(1), or denying employees their right to maternity leave.  Mass. Gen. L. c. 151B, § 4(11A).  All of the aforementioned statutory provisions, including Mass. Gen. L. c. 149, § 105D, are "interpreted and enforced pursuant to c. 151B."  804 C.M.R. § 8.01(1).

In 1976, the Supreme Judicial Court adopted the McDonnell Douglas framework with respect to reviewing claims brought under chapter 151B.  Wheelock Coll. v. Mass. Comm'n Against Discrimination, 371 Mass. 130, 138 (1976); see also Chief Justice for Admin. & Mgmt. of the Trial Court v.  Mass. Comm'n Against Discrimination, 439 Mass. 729, 732 (2003).  Courts interpreting chapter 151B "may look to" but "are not, however, bound by interpretations of the Federal [Title VII] statute in construing our own State [c. 151B] statute."  College-Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination, 400 Mass. 156, 163 (1987).  Bound or not, the framework for resolving chapter 151B pregnancy discrimination claims is very similar to the federal framework for resolving claims brought under the FMLA and PDA:  at stage one, "a plaintiff carries the burden of a prima facie case of discrimination with evidence that: (1) [s]he is a member of a class protected by . . . c. 151B; (2) [s]he performed his job at an acceptable level; (3) [s]he was terminated; and (4) h[er] employer sought to fill the plaintiff's position by hiring another individual with qualifications similar to the plaintiff's," Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 441 (1995); at stage two, the employer must "articulate 'a legitimate, nondiscriminatory reason for its hiring decision' backed by 'credible evidence [showing] that the reason or reasons advanced were

the real reasons,'" Chief Justice, 439 Mass. at 733 (quoting Blare, 419 Mass. at 441-42); and "then, to prevail in the third stage of the analysis, the plaintiff must persuade the trier of fact by a preponderance of the evidence that discriminatory animus was the 'determinative cause' for the employer's decision," id. (quoting Lipchitz v. Raytheon Co., 434 Mass. 493, 504 (2001)), and "[a] fact finder's decision in the third stage may be based, either in whole or in part, on a determination that a legitimate reason for the employer's decision advanced in stage two was actually a pretext."

Id. Further, as the Supreme Judicial Court stated in Blare:

> With respect to summary judgment, it follows that, if a plaintiff has produced evidence sufficient to support a prima facie case of discrimination, and has further offered evidence sufficient to support a determination either that the employer's reason was a pretext or that the actual reason for the adverse hiring decision was discrimination, summary judgment for a defendant is inappropriate. The ultimate issue of discrimination, raised by the plaintiff's and defendants' conflicting evidence as to the defendants' motive, is not for a court to decide on the basis of affidavits, but is for the fact finder after weighing the circumstantial evidence and assessing the credibility of the witnesses.

Blare, 419 Mass. at 445.

### C. Analysis at the First Stage of *McDonnell Douglas*–Prima Facie Case

There is no dispute that Gervais has satisfied the first and third elements required for a prima facie claim: Gervais was a pregnant female employee who sought maternity leave, and thus falls within the ambit of the PDA, the FMLA and both chapter 151B and 149 § 105D, and she suffered an adverse employment action when she was notified on May 7, 2007 that her contract with FPS would not be renewed and when her employment with FPS was terminated on June 14, 2007. FPS does dispute, however, whether Gervais has established the second and fourth elements required for a prima facie claim - that is, whether Gervais was qualified for and was performing at a satisfactory level in her position at FPS, and whether FPS filled Gervais' position with someone of similar

qualifications.

Gervais has provided the Court with sufficient evidence to satisfy the second element. She had a bachelor's degree in flute performance and a teaching credential in Rhode Island, credentials which were sufficient on their own to persuade FPS to hire her; during the course of her employment Gervais also received a master's degree in music education and Massachusetts certification, increasing her qualifications. Additionally, her periodic evaluations by Principal Minkle included no unfavorable notations and never more than one "focus for growth" notation, and her attendance record never exceeded FPS guidelines; her performance at this level was sufficient to justify her renewal for the 2006-07 school year and nothing in the record suggests that her performance level decreased in her second year. Viewing this evidence in the light most favorable to Gervais, as the Court must at this juncture, it is clear that Gervais has provided sufficient evidence to surmount "the low bar required to establish a prime facie case" of discrimination, <u>Harrington v. Aggregate Indus. Ne. Region, Inc.</u>, 668 F.3d 25, 32 (1st Cir. 2012), at least with regard to her qualification for a position with FPS as a music teacher. To the extent FPS argues to the contrary,[5] it relies entirely on affidavits provided by Superintendent Ogden, Assistant Superintendent Sabolinski and Principal Minkle, all of which assert that Gervais' performance was not so good as to ensure that FPS would renew her contract, but none of which assert that her performance was so poor that it rendered her unqualified and compelled FPS to terminate her employment. <u>See, e.g.</u>, Ogden Aff., D. 26-2 at 4-6;

_____

[5] FPS relies heavily on affidavits asserting that Gervais was not an excellent teacher, but it appears to the Court that FPS' reliance on this material is intended to establish a legitimate motivation for FPS' conduct for the purposes of stage two of the <u>McDonnell Douglas</u> burden-shifting framework, rather than to establish that Gervais was unqualified and thus cannot make out a prima facie case at stage one of the framework. <u>See generally</u> FPS Memo, D. 25 at 19-22. In the interest of completeness, the Court will address FPS' arguments at both the first and second stages of the <u>McDonnell Douglas</u> framework.

Sabolinski Aff., D. 26-2 at 10-11; Minkle Aff., D. 26-7 at 5-6.  Furthermore, even if the affidavits did include such assertions, they do not alter the fact that Gervais has provided sufficient evidence of her qualifications to satisfy the "not onerous" burden of setting forth a prima facie case as to her qualifications.  Burdine, 450 U.S. at 253.

With regard to the fourth element, whether Gervais' "position remained open or was filled by someone else with similar qualifications," Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008), FPS correctly points out that Gervais has not alleged, let alone established with any evidence, that her successor had similar qualifications, and FPS has provided affidavits that include uncontroverted assertions that Gervais' successor was in fact better qualified.  Even if the hurdle for establishing a prima facie case is low, it cannot be surmounted without this showing.  "To survive [a] motion for summary judgment, then, [a plaintiff] need[s] to present evidence that show[s] that [her successor]'s qualifications were similar to h[er] own."  Prescott, 538 F.3d at 40 (citing Gu v. Boston Police Dep't, 312 F.3d 6, 11 (1st Cir. 2002).  Since McDonnell Douglas was first handed down, the Supreme Court has been clear that a prima facie discrimination case requires that the plaintiff show that after her employers terminated her employment, "the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."  McDonnell Douglas, 411 U.S. at 802 (emphasis added).  See, e.g., McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 279 n.6 (1976) (prima facie case requires showing that "the position remained open and the employer continued to seek applicants from persons of complainant's qualifications") (quoting McDonnell Douglas, 411 U.S. at 802); Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 305 n.9 (1977) (same); Furnco Constr. Corp. v. Waters, 438 U.S. 567, 575 (1978) (same); Burdine, 450 U.S. at 254 n.6 (same); Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867, 875 (1984) (citing

23

McDonnell Douglas, 411 U.S. at 802); Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 1004 n.4 (1988) (quoting McDonnell Douglas, 411 U.S. at 802); St. Mary's Honor Ctr., 509 U.S. at 506 (citing McDonnell Douglas, 411 U.S. at 802); O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 310 (1996) (quoting McDonnell Douglas, 411 U.S. at 802). This requirement is equally clear under Massachusetts law. See, e.g., Wheelock College, 371 Mass. at 135 n.5 (prima facie case requires showing that "the position remained open and the employer continued to seek applicants from persons of complainant's qualifications") (quoting McDonnell Douglas, 411 U.S. at 802); N.Y. & Mass. Motor Serv., Inc. v. Mass. Comm'n Against Discrimination, 401 Mass. 566, 576 n.11 (1988) (citing McDonnell Douglas, 411 U.S. at 802, and Wheelock College, 371 Mass. at 135 n.5); Blare, 419 Mass. at 441 (prima facie case requires showing that "employer sought to fill the plaintiff's position by hiring another individual with qualifications similar to the plaintiff's"); Chief Justice, 439 Mass. at 732 (prima facie case requires showing "that the employer filled or sought to fill the position with a similarly qualified individual").[6] Here, Gervais' assertion in her brief that her position "was not dissolved, but was subsequently filled with an individual for whom no serious claim has been made was more or better qualified," Gervais Memo, D. 28 at 10, will not do. Gervais has neither pled this allegation nor substantiated it with discovery material. FPS has submitted affidavits expressly contradicting this allegation. To be sure, these affidavits would be insufficient

---

[6] The Supreme Court in McDonnell Douglas noted that "facts necessarily will vary in Title VII cases, and the specification [included] above of the prima facie proof required from [a plaintiff] is not necessarily applicable in every respect to differing factual situations." McDonnell Douglas, 411 U.S. at 802 n.13. The Supreme Judicial Court reiterated this in Wheelock College. Wheelock College, 371 Mass. at 135 n.5 (citing McDonnell Douglas, 411 U.S. at 802 n.13). Gervais has neither asserted that this case poses a factual situation that justifies waiving the fourth prima facie element enumerated by McDonnell Douglas and adopted by Wheelock College nor pointed to any federal or state caselaw that would support deviating from the typical prima facie requirements based on the facts in this case and the Court has found no authority that would support such a deviation.

to compel summary judgment in the face of contrary evidence submitted by Gervais. But absent any such evidence whatsoever the Court has no choice but to conclude that Gervais has failed to carry her burden of setting forth a prima facie case for discrimination under either state or federal law. Such a conclusion entitles FPS to summary judgment. Prescott, 538 F.3d at 40.

Although Gervais' failure to carry her burden at the first stage of the McDonnell Douglas framework is sufficient to resolve FPS' motion and conclude the Court's analysis, the Court will briefly address the remainder of the framework in the interest of completeness.

### D. Second and Third Stages of *McDonnell Douglas* Analysis–Legitimate Motive and Pretext

There is no dispute that FPS has asserted a number of legitimate, non-discriminatory motives for terminating Gervais' employment and has supported those assertions with discovery material. The assertions include that Gervais had shown insufficient professional development to merit retaining her employment, that her attendance history justified terminating her employment, that budgetary considerations required terminating her employment, and that it was prudent to terminate her employment to allow FPS to pursue more highly qualified candidates for her position. Although FPS supports these assertions by relying almost exclusively on affidavits that were written years after the fact and could be construed as self-serving if viewed in the light most favorable to Gervais, the Court's analysis of whether FPS has carried its burden at the second stage of the McDonnell Douglas analysis "can involve no credibility assessment." St. Mary's Honor Ctr., 509 U.S. at 509. FPS has presented evidence sufficient to carry its burden of production and "has thus rebutted any legal presumption of intentional discrimination." Id.

Of course, here, at the final stage of the McDonnell Douglas framework, the parties vigorously dispute the "ultimate question" of whether FPS' proffered legitimate reasons are mere

pretexts for unlawful discrimination against Gervais. St. Mary's Honor Ctr., 509 U.S. at 509. It is clear that at least three of FPS' proffered reasons present genuine issues of material fact and thus would be unlikely to compel summary judgment absent Gervais' failure to establish a prima facie case. As to Gervais' professional development and attendance record, viewing the facts in the light most favorable to Gervais, a factfinder could examine the contemporaneous evaluations of Gervais' work as a teacher and her attendance records and conclude that Gervais' interpretation of those evaluations and records in her subsequent deposition testimony (suggesting that the evaluations were good enough to merit continued employment) was more accurate than the interpretations proffered after the fact by Superintendent Ogden, Assistant Superintendent Sabolinski and Principal Minkle (suggesting they did not), especially in light of the absence of any indication in the CBA or the Faculty Handbook that a teacher with a small number of "focus for growth" notations in his or her evaluations or an attendance history that did not exceed the allowable number of absences would prevent that teacher from having his or her employment renewed. Alternatively, a factfinder could side with FPS' interpretation of the contemporaneous records. Such a decision here is therefore inappropriate for resolution on summary judgment. Similarly, FPS' reliance on budgetary concerns for choosing not to renew Gervais' employment is clearly open to question given that FPS did not choose to retain Gervais after the budgetary crisis had been averted by the May 22, 2007 election. Additionally, FPS' assertion that Gervais' notification of her intention to take FMLA leave is of little moment, given that Gervais had told Principal Minkle of her pregnancy long before Principal Minkle consulted with Superintendent Ogden on FPS' decision to non-renew Gervais' employment, and given that FPS concedes that Superintendent Ogden had received Gervais' notification well before the budgetary crisis had passed and FPS nonetheless opted not to revisit its decision to

terminate Gervais' employment. Because "the mere coincidence between" Gervais' pregnancy "and [FPS'] employment decision," without more, "may give rise to an inference of discriminatory animus," <u>F.W. Morse & Co.</u>, 76 F.3d at 424-425, and because the evidence offered by FPS to controvert that inference could be interpreted by a factfinder either in Gervais' favor or FPS' favor, FPS' assertion that budgetary concerns rather than discriminatory animus drove its employment decisions would best be resolved at trial rather than summary judgment.

FPS' assertion that it chose not to renew Gervais' employment to facilitate the pursuit of more highly qualified candidates stands in a different position. As discussed above, Gervais has presented no evidence whatsoever to contradict this assertion. Nor has she disputed that removing one teacher to free up space to hire superior teachers is a legitimate, non-discriminatory motivation that is consistent with the FMLA, the PDA, and Massachusetts law. Gervais' only argument on this point is a single sentence in her brief, Gervais Memo, D. 28 at 10, and is precisely the sort of "conclusory allegation" that is insufficient to withstand a summary judgment motion, "even in employment discrimination cases where elusive concepts such as motive or intent are at issue" and summary judgment is thus uncommon. <u>Feliciano de la Cruz</u>, 218 F.3d at 5 (internal quotations and citations omitted). Accordingly, it is not clear to the Court that Gervais' claims would have survived FPS' summary judgment motion if (contrary to the Court's discussion above) Gervais had satisfied her initial burden of setting forth a prima facie case.

## VI. Conclusion

"It is never a pleasant task to tell a plaintiff who sincerely feels she was treated unjustly that her case is too weak to warrant a jury trial." <u>Weston-Smith</u>, 153 F. Supp. 2d at 73. Nevertheless, where a plaintiff has failed to establish a prima facie case of discrimination, the defendant is entitled

to summary judgment as a matter of law.  For the reasons discussed above, FPS' motion for summary judgment is GRANTED.

**So ordered.**

<u>/s/ Denise J. Casper</u>
United States District Judge